IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

KATRINA DANIELLE MATEEN                                                    PLAINTIFF

VS                                              CIVIL ACTION NO.: 1:23-cv-00306-TBM-RPM

CITY OF GULFPORT, No. 1, is being sued in their official capacity
As the governing body for the City of Gulfport, Mississippi, located at
2309 15th Street, in Gulfport, Mississippi 39501 for protecting then
Officer/but now Sergeant Kenneth Nassar who shot and killed Jaheim
McMillan, on October 6, 2022, at the Family Dollar Store, located at
1016 Pass Road, in Gulfport, Mississippi 39501

AND

KENNETH NASSAR, No. 2, is being sued in his individual capacity
As Officer/but now Sergeant and was at all time relevant to these
Proceedings was employed by the Gulfport Police Department,
Located at 2220 15th Street, in Gulfport, Mississippi, 39501, while
Working under the color of state law at the time the Defendant shot
And killed Jaheim McMillan, on October 6, 2022, at the Family Dollar
Store, located at 1016 Pass Road, in Gulfport, Mississippi 39501          DEFENDANTS

**MEMORANDUM OF AUTHORITIES OF OFFICER KENNETH
NASSAR IN SUPPORT OF HIS MOTION FOR SUMMARY
JUDGMENT PURSUANT TO FED. R. CIV. P. 56 [DOC. 83]**

    COMES NOW Officer Kenneth Nassar, Defendant in the above cause, by and through his undersigned attorneys, and herein submits this his Memorandum of Authorities in support of his "Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56" [Doc. 83].

## I. <u>INTRODUCTION</u>

*A. PERTINENT PROCEDURAL HISTORY.*

Plaintiff, Katrina Mateen ("Plaintiff") commenced the instant suit with the filing of a Complaint on October 4, 2023, with the Circuit Court of Harrison County, First Judicial District, Mississippi ("State Court") against the City of Gulfport, Mississippi ("City") and Officer Kenneth Nassar ("Officer Nassar"). After Plaintiff served process on the City, the City had this caused removed to the instant forum on the basis of federal question jurisdiction. For reasons unknown, Plaintiff delayed having service of process attempted on the Officer, and then when she did, such service was defective. After service was later (finally) effected, Officer Nassar filed an Answer [Doc. 67] to the suit as well as submitted a separate Motion [Doc. 68] formally asserting his defense of Qualified Immunity and requesting that proceedings be stayed pending a determination of this defense. On August 8, 2024, the Court issued a "Memorandum Opinion and Order" [Doc. 71] granting the City's prior dispositive Motion [Doc. 3] and dismissing all state law and federal law claims against the City in this proceeding with prejudice. On August 20, 2024, the Court issued an Order staying proceedings and setting a deadline for the filing of a dispositive motion on Qualified Immunity. What is remaining in this case is Plaintiff's purported claim against Officer Nassar "in his individual capacity as a Police Officer, employed by the Gulfport Police Department" (<u>see</u> Pl.'s Compl. (Exhibit "A"), p. 10 (¶ 10))[1] for a violation of the "Fourth Amendment" to the United States Constitution for "excessive force" arising out of deadly force utilized by Officer Nassar. <u>See</u> Pl.'s Compl. (Exhibit "A"), p. 14 (¶ 13).

---

[1] Unless specifically noted otherwise, all references to exhibits herein refer to those attached to Officer Nassar's instant "Motion for Summary Judgment" [Doc. 83].

Officer Nassar has now filed with this Honorable Court his "Motion for Summary Judgment" on the basis of his entitlement to qualified immunity. As set out briefly therein, there is an absence of evidence to support Plaintiff's remaining federal law claim against the Officer. Instead, the only existing competent and probative proof demonstrates the Officer did not commit a constitutional violation. Officer Nassar had reasonable cause to believe McMillan posed a significant threat of serious physical harm or injury to himself, others at the scene (*e.g.*, those in the Family Dollar store, etc.), and to passersby when the force attributed to this Officer was taken in response to McMillan's refusal to adhere to loud verbal commands of law enforcement officers at the scene and after McMillan brandished a Taurus 9mm gun as ran toward the front entranceway of the Family Dollar store and then pointed the weapon at the Officer. Based on the totality of the circumstances at this scene, Officer Nassar's use of force was not clearly excessive to the need, nor was it objectively unreasonable. See Tennessee v. Garner, 471 U.S. 1, 11 (1985); Wicker v. City of Galveston, 944 F.Supp. 553, 558 (S.D.Tex. 1996). As a result, Plaintiff can prove no constitutional violation as to Officer Nassar and he is entitled to summary judgment on this basis alone. Even if the Court were to somehow find that an alleged constitutional violation occurred, Officer Nassar is still entitled to qualified immunity since any purported right claimed to have been violated was not clearly established at the time of the incident in question. The Officer is equally entitled to such immunity on the alternate basis that his conduct was objectively reasonable in light of the totality of circumstances he faced during the subject time period. As a result, Plaintiff has failed to discharge her burden to overcome this Defendant's entitlement to qualified immunity. Consequently, Plaintiff Officer Nassar is entitled to summary judgment on Plaintiff's federal law claim for excessive deadly force under the Fourth Amendment. See FED. R. CIV. P. 56.

B.  *THE OCTOBER 6, 2022, INCIDENT.*

At around 2:29 p.m. on October 6, 2022, an emergency 911 call was made to the Gulfport Police Department concerning a silver Kia Soul vehicle southbound on Highway 605 in Gulfport, with the complainant stating that there were multiple occupants in this Kia Soul vehicle and they were following the complainant and brandishing firearms.  See Exhibit "C," p. 2.  The Kia Soul vehicle was reported to have a Georgia license plate.  See id.  The 911 caller further informed police dispatch that this Kia Soul vehicle had followed the vehicle he was in through red traffic lights (*i.e.*, the vehicle had illegally run red lights).  See id.

Police dispatch advised Gulfport Police Units of this call and informed them that these vehicles were initially westbound on Pass Road from Highway 605 and then had turned off various side streets north of Pass Road.  See id.  Officer Nassar at the time was a sworn law enforcement officer for the Gulfport Police Department and served as a Patrol Officer in the Department's Patrol Division.  He and one of his area partners, Officer Benjamin Ford, were on duty at that time (on October 6, 2022) and, while listening to these updates over police dispatch, began traveling westbound on Pass Road (west of its intersection with Highway 605).  See id., at p. 3.  Both Officers were in separate marked police units (official police vehicles that had "Police" markings on the exterior of the vehicle).

While both of these police vehicles were stopped for the traffic light in the westbound lanes of Pass Road at its intersection with 8th Avenue in Gulfport, Officer Nassar observed a vehicle matching the description of the suspect vehicle (a silver Kia Soul) proceed southbound on 8th Avenue and then pull into the parking lot of the Family Dollar store located at 1016 Pass Road in Gulfport.  See id., at p. 3.  As this vehicle pulled in to park in front of the Family Dollar, he also observed it had a Georgia license plate.  See id.  As soon as Officer Nassar had observed

this, he started to attempt to turn out of traffic from the left westbound lane of Pass Road to pull into this parking lot, as did Officer Ford, who activated the emergency police blue lights on his vehicle.  See id.

Officer Nassar observed multiple occupants inside this suspect vehicle moving around erratically as he entered the parking lot.  See id.  Both Officer Nassar and Officer Ford had pulled their police vehicles a row or so behind the suspect vehicle and parked and quickly exited their vehicles.  See id.  As Officer Nassar was exiting his police vehicle, he observed two (2) unknown males exit the silver Kia Soul vehicle and attempt to run at a high rate of speed in between the fronts of two (2) vehicles and the front of the Family Dollar building.  See id.  Officer Nassar was concerned for the safety of others and law enforcement, having been previously advised by dispatch that these occupants (suspects) were brandishing handguns and exhibiting criminal and threatening behavior by reportedly tailing the complainant's vehicle and pointing guns at them.  See id., pp. 3-4.

Officer Nassar then observed one of these two (2) males (later identified to be Jaheim McMillan ("McMillan")) turn around and change directions and begin to run toward the front entranceway of the Family Dollar store.[2]  See id., p. 4.  This individual was wearing jeans and a red hooded looking sweatshirt (which is evidenced in the videos attached to Officer Nassar's Affidavit (Exhibit "C")).  Officer Nassar quickly yelled out in a loud voice "Gulfport Police" to identify himself as a Gulfport law enforcement officer.  See id.  And he also quickly yelled out for McMillan to "stop."  See id.  McMillan refused to adhere to the verbal command.  Officer

---

[2]The MBI video recording (see Exhibit "1" to Exhibit "C") shows Officer Ford running west (away) from the Family Dollar store toward the other male (which was away from Officer Nassar's location) and which left Officer Nassar to also have to consider the safety threat of several other occupants from the suspect vehicle while the incident with the male in the red hoodie sweatshirt was rapidly occurring.

Nassar observed what appeared to be a dark object in McMillan's right hand. See id. And Officer Nassar again yelled out in a loud voice for McMillan to "stop." See id. McMillan still refused to adhere to the Officer's commands. See id. Officer Nassar then clearly observed that McMillan was holding the grip of a black handgun in his right hand and Nassar immediately yelled out in a loud voice to drop the weapon, at which point McMillan turned with the handgun pointed at Nassar as McMillan was approaching the front entranceway of the store. See id. McMillan thereupon appeared to abruptly stop his momentum in order to pivot his body towards the Officer after the gun was being pointed in his direction. See id. As Officer Nassar firmly believed that McMillan would be firing his gun toward him and that he and those in the immediate vicinity were in imminent danger of serious bodily injury or death, the Officer began to fire his service weapon at McMillan in an effort to militate against or prevent this threat. See id. Officer Nassar found McMillan posed an imminent threat of significant bodily harm to the Officer and those in the roadway, in the parking lot, and in the Family Dollar store. See id.

McMillan, though, continued to refuse to comply and ran between a parked vehicle and the front of the store within several feet of the store's front entranceway. See id., pp. 4-5. Officer Nassar reasonably viewed this as a continuing imminent threat and reasonably believed that McMillan was attempting to gain the tactical advantage of cover (through the use of this vehicle). See id., p. 5. Officer Nassar quickly continued to discharge his service weapon in response to this threat. See id. When McMillan attempted to change directions to go back towards the entranceway of the store, he lowered his body and turned toward the store with the right side of his body facing the store. At this time Officer Nassar could not see McMillan's right hand (the one that had been holding the gun). See id. The Officer finished discharging his service weapon as soon he had observed and believed that McMillan was no longer an

immediate threat to the lives and safety of the Officer and nearby public.  See id.  As Officer Nassar has attested, from the point in time when he first discovered McMillan "had something in his right hand (the gun) through the time when he pointed this gun at me and until the incident ended, the facts and circumstances were quickly changing, suddenly moving, and I was fearful of the outcome."  See id.

It was later discovered that the gun that McMillan had brandished was a stolen Taurus 9mm gun, with seven (7) live rounds in the magazine and one (1) live round in its chamber.  See Exhibits "D" and "E."

## II.  LAW AND ARGUMENT

### A.  QUALIFIED IMMUNITY AND SUMMARY JUDGMENT.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); Sims v. City of Moss Point, Civil No. 1:20cv0247-HSO-BWR, 2022 WL 866262, at *2 (S.D. Miss. 2022).  If the movant satisfies this burden, the nonmoving party must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Sims, 2022 WL 866262,  at *2 (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).  "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. (quoting Dyer v. Houston, 964 F.3d 374, 379 (5th Cir. 2020)).

However, "[a] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available."  Sims, 2022 WL 866262,  at *3 (quoting Orr v. Copeland, 844 F.3d 484, 490 (5th Cir. 2016).  Thus, now that Officer Nassar has pled the defense of qualified immunity, the burden of proof

shifts to the Plaintiff to negate this defense. Craig v. Martin, 49 F.4d 404, 409 (5th Cir. 2022) (citing King v. Handorf, 821 F.3d 650, 653 (5th Cir. 2016)).

Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). It is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); see Geter v. Fortenberry, 849 F.2d 1550, 1552 (5th Cir. 1988) (Geter I) (holding qualified immunity is "immunity from suit, not simply immunity from liability"). Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. See Anderson, 483 U.S. at 638 (holding that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. Such immunity is intended to protect law enforcement officers from "bad guesses in gray areas" and insure they are liable only for transgressing "bright lines."[3] Hart v. O'Brien, 127 F.3d 424, 453 (5th Cir. 1997). The "doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages." Davis v. Scherer, 468 U.S. 183, 195 (1984).

---

[3] The consequences with which the United States Supreme Court was concerned when it recognized qualified immunity were "not limited to liability for money damages; they also include[d] 'the general costs of subjecting officials to the risks of trial--distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.'" Mitchell, 472 U.S. at 525-26.

Consistent with the notion that such immunity to public officials is an immunity from suit, the Supreme Court and the Fifth Circuit have emphasized that qualified immunity questions should be resolved at the "earliest possible stage of a litigation." Geter, 849 F.2d at 1553. Moreover, "[w]hen sued in his individual capacity, a[n official] is entitled to a presumption of qualified immunity from suit." See Pfannstiel v. City of Marion, 918 F.2d 1178, 1183 (5th Cir. 1990), abrogated on other grounds, Martin v. Thomas, 973 F.2d 449 (5th Cir.1992). To overcome this presumption, a plaintiff has the burden to prove that no reasonable, similarly situated official could have considered the conduct of the government official to be lawful, under the circumstances known to him at the time. See Anderson, 483 U.S. at 640-41.

In considering qualified immunity in excessive force cases similar to the one at bar, courts previously considered whether the right was clearly established and, if so, whether in light of such clearly established law a reasonable officer could have known that his or her conduct was unlawful. See Saucier v. Katz, 533 U.S. 194, 201-02 (2001) (citing Graham v. Connor, 490 U.S. 386 (1989)). However, the Supreme Court has since clarified that there is no set or prescribed sequence to consider the inquiries involving qualified immunity and "judges of the district courts ... [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . . ." Byrd v. Cornelius, 52 F.4d 265, 271 (5th Cir. 2022) (quoting Pearson v. Callahan, 555 U.S. 223, 236 (2009)). One of these "prongs" (inquiries) looks at whether the officer's conduct violated a constitutional right. See Saucier, 533 U.S. at 201. If no constitutional right was violated, the court need not inquire further. Id. The other focus is on whether the violated right was clearly established at the time of the subject incident. Id., at 201-02. Importantly, this review must be undertaken in the "specific context of the case, not as a broad general proposition." Id. The proper inquiry is whether it would be

apparent to a reasonable officer that his conduct was unlawful in the situation he confronted, and that right must be clearly established at the time of the alleged violation. Id., at 202. If the violation of such a right is proven, the Court must still determine if the official's conduct was objectively reasonable under the circumstances so that a reasonably competent officer would not have known his actions violated then-existing clearly established law. Id. Such "objective reasonableness" is a matter of law for the courts to decide. See Siegert v. Gilley, 500 U.S. 226, 232 (1991). Thus, while the Supreme Court has directed that the inquiries for constitutional violations and qualified immunity remain distinct, a determination as to whether there has been a constitutional violation may precede but still be a part of the qualified immunity analysis. See e.g., Saucier, 533 U.S. at 201, 204.

  1. *NO CONSTITUTIONAL VIOLATION*

In considering the qualified immunity inquiry, the Court must determine whether there was a violation of a constitutional right. Again, in the case at bar, the sole remaining federal law claim asserted by Plaintiff (presumably under 28 U.S.C. § 1983) is that Officer Nassar used "excessive" deadly force in violation of the Fourth Amendment when he shot McMillan. See Exhibit "A," p. 14 (¶ 13). Such an allegation of "excessive force, deadly or not, in the course of an arrest, investigatory stop, or other seizure" implicate the Fourth Amendment's guarantee of freedom from unreasonable seizures. Graham, 490 U.S. at 394-95. In Graham, the Supreme Court noted that "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. The Court cautioned that determining issues of excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id., at 397.

In Tennessee v. Garner, 471 U.S. 1 (1985), the United States Supreme Court held that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Garner, 471 U.S. at 8. Under such an analysis in the Fifth Circuit, a plaintiff must demonstrate "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." Goodson v. City of Corpus Christie, 202 F.3d 730, 740 (5th Cir. 2000); Spann v. Rainey, 987 F.2d 1110, 1115 (5th Cir. 1993); see also Byrd v. Cornelius, 52 F.4d 265, 271 (5th Cir. 2022) (recognizing a plaintiff must demonstrate: "(1) injury, (2) which resulted directly and only from a **use of force that was clearly excessive**, and (3) the excessiveness of which was **clearly unreasonable**" (emphasis added)). The Supreme Court has recognized that deadly force may be used and is reasonable as a matter of law, though, when an officer has "probable cause to believe that an individual poses a threat of serious physical harm, either to the officer or to others." Garner, 471 U.S. at 11. The Court has further provided some examples of when such force is permissible:

> if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used to prevent escape, and if, where feasible, some warning has been given.

Id., 471 U.S. at 11-12. "'[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally

unreasonable to prevent escape by using deadly force.'"[4] Garner, 471 U.S. at 11; see Sims, 2022 WL 866262, at * 3; see also, Wilson, 26 F.4d at 713.

Again, there is no Fourth Amendment violation when deadly force is employed if an officer has probable cause to believe that an individual poses a "threat of serious physical harm, either to the officer or to others." Garner, 471 U.S. at 11. There can be no question whatsoever that, as demonstrated supra, there was such a threat when McMillan refused to adhere to the commands of law enforcement at the scene and then brandished a deadly weapon in his right hand (a handgun) at the Officer.[5] Based on the totality of the circumstances at the incident scene, Officer Nassar's use of force was not clearly excessive to the need, nor was it objectively unreasonable. See Wicker, 944 F.Supp. at 558. Rather, it was a justifiable response to a threat of potential serious physical harm to the on-scene Officers (including Officer Nassar himself) and others. As a matter of law, no violation of the Fourth Amendment occurred. See Young v. City of Killeen, 775 F.2d 1349, 1353 (5th Cir. 1985) (holding that if individual's movements gave officer cause to believe that there was threat of serious physical harm, officer's use of deadly force was not constitutional violation); see also Stroik v. Ponseti, 35 F.3d 155, 159 (5th Cir. 1994); Reese, 926 F.2d at 501.

---

[4] Because of the difficulty of "split second judgments," "[t]he 'reasonableness' of a particular use of force **must be judged from the perspective of a reasonable officer on the scene**, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (emphasis added); see also, Wilson, 26 F.4d at 713. This means that the "overarching question is 'whether the officers' actions are **objectively reasonable** in light of the facts and circumstances confronting them." Id. (Emphasis added).

[5] Courts have previously held that deadly force is warranted in response to suspects who defy officials' orders and display movements or actions that could be reasonably viewed as threatening. See Reese v. Anderson, 926 F.2d 494, 500-501 (5th Cir. 1991).

*2. EVEN IF THE COURT WERE TO SOMEHOW FIND THAT OFFICER NASSAR ENGAGED IN DEADLY FORCE THAT WAS IN VIOLATION OF THE FOURTH AMENDMENT, THERE IS NOTHING TO DEMONSTRATE THAT THE USE OF SUCH FORCE VIOLATED A CLEARLY ESTABLISHED RIGHT.*

Under qualified immunity analysis, even if a constitutional violation somehow occurred, Officer Nassar is still entitled to qualified immunity if the right claimed to have been violated was not clearly established at the time of the incident sued upon. Saucier, 533 U.S. at 201-02. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id., at 201. That is, the right an official is alleged to have violated must have been "clearly established" "in a more particularized, and hence more relevant, sense." Anderson, 483 U.S. at 640; see Saucier, 533 U.S. at 207 (courts should "elaborate the constitutional right with greater degrees of **specificity**") (emphasis added); see also Wilson v. Layne, 526 U.S. 603, 615 (1999) ("right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established"). Moreover, case law "must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Pierce v. Smith, 117 F.3d 866, 882 (5th Cir. 1997) (quoting Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)). A right is "clearly established" only when "its contours are sufficiently clear that a reasonable official would have realized that his conduct violated that right, not simply that the conduct was otherwise improper" or that "he was doing something wrong." Foster v. City of Lake Jackson, 28 F.3d 425, 429-30 (5th Cir. 1994). Also, "[i]t is not the defendants' burden to identify clearly established law showing that they *did not* violate the plaintiffs' constitutional rights. Rather, it is the plaintiffs' burden to provide clearly established law that put the officers on notice that they *did* violate the plaintiffs' constitutional rights – and the plaintiffs' burden is heavy." Dawes v.

City of Dallas, 2022 U.S. Dist. Lexis 143342 *22 (N.D. Tex. 2022) (emphasis in original) (citing Vann v. City of Southaven, 884 F.3d 307, 310 (5th Cir. 2018); Harmon v. City of Arlington, 16 F.4th 1159, 1165 (5th Cir. 2021)).

In the case *sub judice*, even were the Court to somehow conclude that Officer Nassar committed a constitutional violation under the situation set out above, at a minimum it was not clear at the time of the October 2022 incident that the Officer was not justified in using deadly force in response to McMillan's act of brandishing a deadly weapon (a handgun) after refusing to adhere to several verbal commands of law enforcement at the scene and then aiming his weapon at the Officer. Of course, the contrary is true; that is, such non-compliant and life threatening actions legally warrant the use of deadly force. See Garner, 471 U.S. at 11. However, there was also no clearly established law that precluded the use of deadly force in response to McMillan's use of a deadly weapon under the circumstances, even after he was ordered to drop the weapon and then pointed the weapon at Officer Nassar.

Moreover, McMillan's actions posed a significant threat of bodily injury to the general public, including motorists in the roadway behind Officer Nassar and those outside of the subject "Family Dollar" store (and inside the store), possible occupants in parked vehicles in this business' parking lot, and customers at this store, as well as the other occupants in the Kia Soul vehicle from which McMillan exited, and thereby warranted the use of force. It would also not have been clear to a reasonable officer at the time of this October 2022 incident that deadly force was impermissible in response to the resistive, non-compliant, and deadly measures being undertaken by McMillan in light of all the circumstances previously taken in and understood by Officer Nassar leading up to his arrival at this scene and while on this scene (e.g., McMillan and other occupants from this Kia Soul brandishing deadly weapons (guns) at other motorists prior to

arriving at this "Family Dollar" business and McMillan's vehicle (the Kia Soul) chasing down another vehicle (the 911 caller) in a threatening manner, etc.) and after McMillan was told to drop his weapon and the gun in McMillan's right hand was observed by Officer Nassar to be pointing at him. See e.g., Young, 775 F.2d at 1353. In addition, no reasonable officer could have thought it constitutionally impermissible to use force when McMillan's weapon (his subject handgun) was being moved in the manner and way it was shortly prior to and at the time that Officer Nassar discharged his service weapon in response. Accordingly, even if the Court were to somehow find that a constitutional violation occurred, nothing was "clearly established" in the required more "particularized" sense that the Officer violated McMillan's Fourth Amendment rights at the time of the incident. See Anderson, 483 U.S. at 635; see also Saucier, 533 U.S. at 202.

3. NOTWITHSTANDING THE VIOLATION OF ANY CLEARLY ESTABLISHED RIGHT, THE OFFICER'S ACTIONS WERE OBJECTIVELY REASONABLE.

Even if Officer Nassar violated a federal right that was clearly established, he is still qualifiedly immune if his actions were objectively reasonable under existing clearly established law. Saucier, 533 U.S. at 204-05; see Siegert, 500 U.S. at 231-32; Anderson, 483 U.S. at 641. The inquiry thus is whether there was a mistaken understanding as to whether the force used was legal under the circumstances with which the Officer was confronted. Glenn v. City of Tyler, 242 F.3d 307, 312 (5th Cir. 2001). This question is a matter of law for the Court to decide. See Siegert, 500 U.S. at 232. To this end, the Court must presume the Officer's acts were objectively reasonable unless all reasonable officials in the officers' circumstances would have then known that the conduct in question violated the Plaintiff's constitutional right. Malley v. Briggs, 475 U.S. 335, 341 (1986); see Anderson, 483 U.S. at 641; Pierce, 117 F.3d at 872. Moreover, "objective reasonableness" is "judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396-97; see Anderson, 483 U.S. at 641. As the Supreme Court in Graham held:

> [t]he calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396-97. There are various factors that can be considered to assist in this inquiry, including whether an individual poses an immediate threat to the safety of the officers or others and whether an individual is actively resisting arrest. Id., at 396 (citing Garner, 471 U.S. at 8-9).

There can be no question that under the circumstances, a reasonable officer would have already been concerned and his or her attention heightened when confronted with the facts and circumstances that were heard, received, and considered by the Officer leading up to his arrival at the scene in question. Again, the Officer was already apprised of the emergency call that precipitated the response of law enforcement and made aware (by way of this emergency call) of the fact that handguns (deadly weapons) were being brandished by the occupants of the subject vehicle (the Kia Soul occupied by McMillan). Any reasonable officer on the scene upon discovering that McMillan, as he quickly exited his vehicle and disregarded law enforcement commands verbalized to stop and drop his gun, was instead brandishing his deadly weapon and raising it upward toward this officer, would have clearly been concerned and fearful. Force was used by Officer Nassar in response to McMillan's gun being observed by the Officer to be in McMillan's right hand and aimed toward the Officer. There can be no question that any reasonable officer would have thought such application of force reasonable and lawful in view of the circumstances that he or she faced as well as based on the events that preceded these. See Graham, 490 U.S. at 396-97. McMillan's actions unfortunately posed life threatening,

significant, and immediate threats to the safety of all involved (as well as passing traffic). See Flatt v. City of Lancaster, No.Civ.A.3:98-CV-3945, 2000 WL 1225787, at *2 (N.D.Tex. Aug. 28, 2000). As seen, there is nothing to demonstrate that all reasonable officers in the position of the Officer Nassar would have clearly understood that they should not have used the force attributed to them, even if such force was somehow construed to be constitutionally impermissible, in view of all of the rapidly-evolving circumstances before them at the scene. Consequently, Officer Nassar is entitled to qualified immunity and a summary judgment on such alternate grounds.

### III.  CONCLUSION

The force attributed to Officer Nassar was not clearly excessive to the need, nor was it objectively unreasonable. Moreover, given the totality of the circumstances facing this Officer, his actions were objectively reasonable under existing clearly established law. As a consequence, and to the extent the Court were to somehow find that the Officer engaged in excessive deadly force, he is entitled to qualified immunity. For each and all of the reasons stated herein and in any supportive rebuttal or accompanying memoranda, it is respectfully submitted that the Court should issue an Order granting the Motion of Officer Nassar for Summary Judgment Pursuant to FED. R. CIV. P. 56 and fully dismissing this cause against this Defendant with prejudice on any of the alternative bases provided as well as granting all other relief to which this Defendant may be entitled.

RESPECTFULLY SUBMITTED, this the __19th__ day of September, 2024.

OFFICER KENNETH NASSAR,
Defendant

By: _s/ Jeffrey S. Bruni_____.
    JEFFREY S. BRUNI, ESQ.
    Attorney for Officer Kenneth Nassar
    MS Bar License No. 9573

## *CERTIFICATE OF SERVICE*

  I, Jeffrey S. Bruni, Esq., Attorney for Officer Kenneth Nassar, do hereby certify that I have on this date electronically filed the above and foregoing document with the Clerk of the Court using the ECF/MEC system, which should send notification of such filing to the Plaintiff, Katrina Mateen, 12069 George Street, Gulfport, Mississippi 39503 and to all counsel of record who have made an appearance in this matter.

  This the 19th day of September, 2024.
.

                *s/ Jeffrey S. Bruni*
                JEFFREY S. BRUNI


JEFFREY S. BRUNI, ESQ.
POST OFFICE BOX 1780
GULFPORT, MISSISSIPPI   39502
TELEPHONE:  (228) 868-5811
FACSIMILE:  (228) 868-5795